## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| Donald Yarbrough, Chris Mitchell, and Willie Anderson, and, individually on behalf of themselves and all other persons similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| City of Peoria, Illinois, a municipal corporation; Patrick Urich, not individually, but in his official capacity as the City Manager; Rita Ali, not individually, but in her official capacity as the Mayor of the City;  Denise Jackson, Charles V. Grayeb, Timothy Riggenbach, Andre W. Allen, Denis Cyr, John L. Kelly, Zachary M. Oyler, Dr. Kiran Velpula, Dr. Bernice Gordon-Young, and Michael P. Vespa, not individually, but in their official capacities as Council Members for the City of Peoria, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.<br><br><br><br>Jury Trial Requested |
| Defendants. | ) | |

## CLASS COMPLAINT

Plaintiffs, Donald Yarbrough, Chris Mitchell, and Willie Anderson (sometimes collectively referred to herein as "Named Plaintiffs"), individually on behalf of themselves and all other persons similarly situated, by their attorneys, Jennifer M. Sender, of Hughes, Socol, Piers, Resnick & Dym, Ltd., Carl F. Reardon, Esq., and Jim Rochford and Nina R. Gougis, of Jim Rochford & Associates, complain of Defendants, City of Peoria, an Illinois municipal corporation, Patrick Urich, not individually, but in his official capacity as the City Manager; Rita Ali, not individually, but in her official capacity as the Mayor of the City; Denise Jackson, Charles V.

1

Grayeb, Timothy Riggenbach, Andre W. Allen, Denis Cyr, John L. Kelly, Zachary M. Oyler, Dr. Kiran Velpula, Dr. Bernice Gordon-Young, and Michael P. Vespa, not individually, but in their official capacities as Council Members for the City of Peoria, as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the Named Plaintiffs' claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq*. Declaratory relief is authorized by 28 U.S.C. §§ 2201(a) and 2202 and FED. R. CIV. P. 57. Injunctive relief is authorized by FED. R. CIV. P. 65.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Defendants reside in this district and all the events or omissions giving rise to claims occurred in this district.

## THE PARTIES

3.      Plaintiff Donald Yarbrough ("Mr. Yarbrough") is a resident of Peoria, Illinois. Plaintiff Donald Yarbrough ("Mr. Yarbrough") is a resident of Peoria, Illinois. He sustained bilateral foot injuries (diagnosed as Emerson's injury by the Veteran's Administration), resulting in difficulty ambulating. He must use prosthetics to ambulate, and, even with prosthetics, he can only ambulate short distances. Mr. Yarbrough uses a scooter to ambulate any longer distances. He is a "qualified person with a disability" within the meaning of all applicable statutes.

4.      Plaintiff Chris Mitchell ("Ms. Mitchell") is a resident of Peoria, Illinois. She was born with Cerebral Palsy and in childhood contracted Polio, resulting in problems ambulating and requiring the use of a walker. She is a "qualified person with a disability" within the meaning of all applicable statutes.

2

5.      Plaintiff Willie Anderson ("Mr. Anderson") is a resident of Peoria, Illinois. He sustained unilateral leg amputation, resulting in problems ambulating and requiring the use of crutches and, for distances, a wheelchair. He is a "qualified person with a disability" within the meaning of all applicable statutes.

6.      Defendant City of Peoria ("City") is an Illinois municipal corporation and is the county seat of Peoria County in the State of Illinois. With a population of approximately 111,021 (estimate, as of July 1, 2022, U.S. Census Bureau), the City is the second largest city in Central Illinois.

7.      The City has been and is a public entity within the meaning of Title II of the ADA and has received and does receive federal financial assistance and is therefore a covered entity within the meaning of the Rehabilitation Act. The City is a local governmental entity with the responsibility of providing the Named Plaintiffs, and all other persons with mobility disabilities, with access to its public facilities, programs, services and activities. The City is responsible for constructing, maintaining, repairing, and the regulation of, the system of pedestrian rights-of-way within the City.

8.      The City is administered by a council-manager form of government, comprised of the Mayor, ten council members, and a City Manager appointed by the council.

9.      Defendant Patrick Urich is the City Manager, appointed on or about April 13, 2011. As the City Manager, Mr. Urich is responsible for overseeing the day-to-day activities of the City of Peoria, including the $169 million budget, 14 departments, and approximately 660 full-time and part-time employees.

10.      Defendant Rita Ali is the Mayor of the City and a former council member. Defendants, Denise Jackson, Charles V. Grayeb, Timothy Riggenbach, Andre W. Allen, Denis

Cyr, John L. Kelly, Zachary M. Oyler, Dr. Kiran Velpula, Dr. Bernice Gordon-Young, and Michael P. Vespa, are members of the City Council. They are each, in their official capacities, legally responsible for ensuring the City's compliance with federal and state laws, including the implementation of the City's transition plans. Collectively, they are sometimes referred to herein as the "City Council."

## BACKGROUND FACTS

11.     The City has an expansive pedestrian system that links neighborhoods, recreational resources, government facilities, schools, public transportation, places of worship, retail centers and business establishments that, while intended to benefit all residents and visitors, discriminates against persons with mobility disabilities. This lawsuit is brought to redress the Defendants' systemic, pervasive, and continuing discrimination against the Named Plaintiffs, and persons similarly situated, with mobility disabilities, through the denial of meaningful access to those neighborhoods, recreational resources, government facilities, schools, transportation, places of worship, retail centers and business establishments through its pedestrian system.

12.     The City's curb ramps, sidewalks, school crosswalks, public crosswalks, bus stops, pedestrian crossings, and other walkways (hereafter, "pedestrian rights-of-way") are largely inaccessible to persons with mobility disabilities. As alleged herein, the City has failed and continues to fail to construct or maintain pedestrian rights-of-way throughout the City and to install and maintain curb ramps and bus stops that are necessary to make its pedestrian rights-of-way readily accessible to persons with mobility disabilities.

13.     The City's pedestrian rights-of-way, when viewed in their entirety, are not readily accessible to and usable by persons with mobility disabilities due to the pervasive existence of numerous architectural and other physical access barriers along the paths of travel. The City has,

or has caused to be constructed, and has failed, or has caused to fail to eliminate these barriers. A substantial number of the City's sidewalks are in disrepair. A substantial number of street crossings within the City's pedestrian rights-of-way do not comply with applicable federal regulations addressing accessibility for people with disabilities because, for example, they lack curb ramps entirely, have curb ramps only on one side of a corner, have curb ramps with inadequate landings or are deteriorated and dangerous. A significant number of the City's sidewalks have streetlights or utilities poles, traffic signs, curbs/walls, stairs, or other obstructions permanently embedded in sidewalks without providing required paths of travel for persons with mobility disabilities utilizing mobility devices such as wheelchairs and scooters. A significant number of stops for the City buses do not have sidewalks, curb cuts, or waiting areas to allow access for persons with mobility disabilities.

14.     The City's pedestrian rights-of-way are a fundamental public program, service, and activity that the City provides for the benefit of its residents and visitors. Named Plaintiffs, and other persons similarly situated with mobility disabilities, must choose between remaining segregated from significant amounts of daily activities, including visiting public facilities, places of public accommodation, and friends, and thereby remaining safe, or risking injury or death by traveling on or around inaccessible pedestrian rights-of-way, in busy streets alongside automobiles and other vehicles. Lack of access to the City's system of pedestrian rights-of-way deprives people with mobility disabilities of their independence, and essentially relegates them to second-class citizen status. This problem is exacerbated further by the fact that a significant number of city bus stops are not accessible for persons with mobility disabilities who use mobility devices.

15.     During winter, the City's sidewalks become greater hazards to the Named Plaintiffs and all other persons similarly situated with mobility disabilities, as a great number of the curb

cuts are difficult to find or use when buried in snow, and the uneven sidewalks, deteriorated concrete, raised sidewalk panels and all other defects in the sidewalks become undetectable when they are covered in snow. Many of the City's sidewalks become unnavigable for the Named Plaintiffs and all other persons similarly situated with mobility disabilities as the City does not enforce its ordinance on snow removal. Further, bus stops become unnavigable for the Named Plaintiffs and all other persons similarly situated with mobility disabilities because the routes to the bus stop are difficult to find or use when buried in snow.

16.     The discrimination and denial of meaningful access to the City's pedestrian rights-of-way for persons with mobility disabilities complained of herein is the direct result of the City's policies and practices regarding the pedestrian rights-of-way and disability access, including but not limited to the failure to:

a.      Conduct a comprehensive survey or update any prior surveys of the City's pedestrian rights-of-way system to identify all intersections lacking accessible curb ramps, sidewalks which are inaccessible, and inaccessible paths of travel for bus stops;

b.      Adopt a specific plan with a reasonable schedule to comply with its requirements under the Americans with Disabilities Act (the "ADA"), and the Rehabilitation Act of 1973 (the "Rehabilitation Act") for accessible pedestrian rights-of-way system;

c.      Install curb ramps at intersections in the City that are necessary to provide meaningful access to pedestrian rights-of-way;

d.      Install accessible curb ramps at locations where no curb ramps exist, or where inaccessible curb ramps exist, within the time required by applicable state and federal disability access laws or on any other reasonable schedule;

e.      Install accessible curb ramps within the time permitted by statute or within any other reasonable timeframe, after receiving a request to do so or otherwise being notified of the need for a curb ramp at a particular location;

f.      Ensure the repair or elimination of barriers to access on City sidewalks or other pedestrian rights-of-way in the form of broken, cracked, crumbled, steep, sunken, uneven or otherwise inaccessible surfaces, as well as obstacles placed in paths of travel, such as streetlights and utility poles, traffic sign posts, curbs/walls, stairs,

and snow, when necessary to provide meaningful access to pedestrian rights-of-way;

g.    Develop and implement a process for comprehensively and accurately identifying intersections throughout the City at which curb ramps and accessible pedestrian signals are necessary to provide meaningful access to pedestrian rights-of-way;

h.    Adopt or implement and enforce policies and procedures for inspecting, repairing, and maintaining pedestrian rights-of-way free from barriers to access.

17.    The aforesaid policies and practices, and the lack thereof, have resulted in discrimination against persons with mobility disabilities in the form of denial of access to the City's pedestrian rights-of-way that manifest in common ways throughout the City.

18.    Accessibility of pedestrian rights-of-way goes to the heart of the purpose of the ADA, the Rehabilitation Act, and other disability rights laws. This lawsuit seeks to force the City to comply with these laws and finally, after nearly 35 years since the enactment of the ADA and 50 years since the enactment of the Rehabilitation Act, to provide access to pedestrian rights-of-way for all residents.

## CLASS ALLEGATIONS

19.    Pursuant to FED. R. CIV. P. 23(a), Named Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated. Named Plaintiffs seek to represent a class composed of all persons with mobility disabilities who reside in the City, and who have been denied access, based on their disability, to the pedestrian rights-of-way in the City, within the past two years from the date of the filing of this lawsuit through the trial of this matter.

20.    Each member of the proposed class is a "qualified person with a disability" and/or a person with a "disability" pursuant to 42 U.S.C. § 12131(2) and 29 U.S.C. § 794(a).

21.    Whether a person is a member of the class can be readily ascertained from certain of the City's own records. For example, the City distributes "handicapped" parking permits to

residents, for which they presumably keep records identifying the residents who apply and are provided permits.[1] Additionally, the Peoria Housing Authority ("PHA"), which administers the City's low-income housing program, provides ADA compliant units within their 700 units of housing.[2] Each resident of those properties is required to complete the PHA's application, which includes specific provisions for those applicants to request reasonable accommodations based upon disability with a disclosure for the accommodation required related to a disability.

21.     The persons in the class are so numerous that joinder of all persons is impracticable and the disposition of their claims in a class action, rather than in individual actions, will benefit the parties and the Court. Named Plaintiffs are informed and believe that the class consists of well over one hundred residents or more with mobility disabilities. According to the United States Census reports for Peoria, Illinois for 2020, Peoria had an estimated population of 113,176 persons.[3] The Census reports identify that 7% of Peoria's population have an "ambulatory" disability.[4] When those statistics are applied to Peoria's population data, it can be reasonably assumed that Peoria is home to at least 7,900 residents with mobility disabilities.

22.     Considering that Peoria is the County Seat of and largest City in Peoria County and home to a State of Illinois courthouse, a federal courthouse, four hospitals, and five colleges, it is not unreasonable to assume that Peoria welcomes visitors from the surrounding Peoria County. Peoria County is home to an additional approximately 68,000 individuals thereby significantly increasing the potential class by at least 4000 individuals with mobility disabilities.[5]

---

[1] https://peoriagov.org/440/Parking-Information
[2] https://www.census.gov/quickfacts/fact/table/peoriacityillinois/PST040222
[3] https://www.census.gov/quickfacts/fact/table/peoriacityillinois/PST040222

[4] https://data.census.gov/profile/Peoria_city,_Illinois?g=160XX00US1759000#health
[5] https://data.census.gov/profile?g=050XX00US17143

23.     The Peoria Housing Authority ("PHA"), the City's low-income housing program, provides 700 housing units across 8 facilities throughout the City, with ADA units available.[6] Even with a conservative estimate that one resident resides in each of those 700 units and conservatively estimating that 7% of those residents have a mobility disability,[7] [8] the public housing facilities alone house 49 residents who are potential class members.

24.     As identified below, there are common questions of law and fact involved that affect the parties to be represented in that they are all being denied, or will be denied, their civil rights of full and equal enjoyment of the City's pedestrian rights-of-way due to the general policy and practices of the Defendants, as described herein.

25.     Defendants' discriminatory conduct is not unique to the Named Plaintiffs. The claims of Named Plaintiffs are typical of the claims of the class, because Named Plaintiffs are similarly affected by the same course of conduct, namely Defendants' failure to provide and maintain accessible pedestrian rights-of-way.

26.     Named Plaintiffs are adequate class representatives, because each of them has been directly impacted by Defendants' failure to provide and maintain accessible pedestrian rights-of-way. The interests of the Named Plaintiffs are not antagonistic to or otherwise in conflict with the interests of the class as a whole. The attorneys representing the class are experienced in

---

[6] https://www.peoriahousing.org/publicHousing.aspx

[7] Data from 2021 revealed the population of people living below poverty levels is disproportionately high for people with disabilities (25%) compared to people without disabilities (9%). www.census.*gov*/content/dam/Census/library/publications/2022/demo/p60-277.pdf.  Further, according to data from the Illinois Center for Budget and Policy Priorities, 25% of the Illinois residents receiving federal rental assistance have a disability. https://www.cbpp.org/research/policy-basics-federal-rental-assistance

representing clients in class actions, class action civil rights claims, and claims against municipalities.

27.     Class certification is appropriate under FED. R. CIV. P. 23(b)(2), because Defendants have acted and/or failed to act on grounds applicable to the class as a whole, making final declaratory and injunctive relief for the class as a whole superior to all other methods of disposition.

28.     Class certification is appropriate under FED. R. CIV. P. 23(b)(3), because questions of law and fact common to class members predominate over other available methods for the fair and efficient adjudication of this litigation. Common questions of fact and law include, but are not limited to the following:

    a.    Whether Defendants are violating Title II of the ADA, 42 U.S.C. § 12131, *et seq.,* by failing to make their programs, services and activities accessible to and useable by persons with mobility disabilities, and otherwise discriminating against persons with mobility disabilities as set forth herein;

    b.    Whether Defendants are violating Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. Title II of the ADA, 42 U.S.C. § 12131, *et seq.,* by failing to make their programs, services and activities accessible to and useable by persons with mobility disabilities, and otherwise discriminating against persons with mobility disabilities as set forth herein;

    c.    Whether Defendants have performed or have caused to be performed "new construction" and/or "alterations" to the City's pedestrian rights-of-way within the meaning of 28 C.F.R. § 35.151, triggering an obligation to construct or retrofit curb ramps and sidewalks;

    d.    Whether Defendants have performed or have caused to be performed "new construction" and/or "alterations" to the City's pedestrian rights-of-way within the meaning of 45 C.F.R. § 84.23, triggering an obligation to construct or retrofit curb ramps and sidewalks;

    e.    Whether Defendants, by their acts and omissions alleged herein, have engaged in a pattern or practice of discriminating against Named Plaintiffs and members of the class based on their disabilities in violation of applicable federal laws; and

      f.     Whether the injunctive relief sought by the Named Plaintiffs, if implemented, would resolve the claims of the class members.

29.     The interests of members of the class in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute an action because of limited financial resources; and the amounts at stake for individuals, while significant, are relatively small for most or all the class members contrasted with the costs of prosecution.

30.     A class action would be manageable. Individualized litigation presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims that might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## DEFENDANTS' CONDUCT

31.     In 1993, the City conducted a self-assessment of its intersection curb ramps for compliance with the ADA and determined that 4435 intersection quadrants (the sidewalk corner areas adjacent and between the intersecting roads; *e.g.* a four-way intersection has four quadrants) required curb ramps.

32.     In 1995, the City adopted a "Handicapped Ramp Transition Plan," which provided a 10-year, prioritized plan to install 2298 curb ramps throughout the City at a cost of $2,244,439.

33.     According to the City, it installed 1263 curb ramps from 1995 through 2007, which represented only 55% of the total curb ramps planned for installation in the Handicapped Ramp Transition Plan, and only 25% of the missing curb ramps identified in the 1993 self-assessment.

34.     In 2007, the City conducted a second self-assessment of its intersection curb ramps. Per the report, the total number of existing curb ramps was 4791. The self-assessment disclosed:

only 387 curb ramps (8%) were fully compliant with the ADA; 2603 locations (54%) had curb ramps which complied with the "geometry" required by the ADA (no explanation of what was assessed) but lacked the required contrasting color truncated dome/detectable warning panels; 1801 curb ramps (37.6%) were non-complaint with the requirements of the ADA regarding slopes and tapers. The self-assessment further identified that 1143 intersection locations needed ramps built. By the City's own admission, 17 years after the ADA passed, only 8% of the *existing* curb ramps were fully compliant with the ADA and of the total of locations where curb ramps should exist, almost 20% were missing.

35.     Between 2008 and 2010, 79 ramps were installed. Between 2010 and 2011, another 82 were installed. The City's records do not identify if those new ramps were replacing non-compliant ramps or were newly installed ramps. Assuming no new locations from 2007 required curb ramps and these were *new* ramps where none existed, the City only installed 14% of the missing ramps identified in 2007.  Further, the City's records do not indicate if any of the 4,404 non-compliant ramps identified in 2007 were remediated.

36.     In a Request for City Council Action, dated May 22, 2012, Defendant Ulrich requested approval of the 2012 Americans with Disabilities Act Transition Plan Update ("2012 Updated Transition Plan") and requested $1,000,000 be allocated in the 2012-2013 Fiscal Year for ramp construction, noting that the cost to install a new ramp was $2,500. Based on the total remaining number of "missing" ramps identified in 2007 (982 ramps), that allocation could have funded the installation of 400 ramps in 2012-2013. The Request for Council Action also indicated that "some" of the $24,700,000 funds allocated for the "Arterial Overlay and Arterial Street" reconstruction projects could be used to improve sidewalks and ramps for accessibility along the arterial streets.

37.     In the Request for City Council Action of May 22, 2012, Defendant Ulrich represented that the 2012 Updated Transition Plan includes a "Plan, resources, and schedule to move toward compliance with a goal of installing over 1000 ramps in the next five years."  To the contrary, the City of Peoria's ADA Transition Plan Updated 2012 did not contain any specific plan, timeline, or funding for the installation of missing curb ramps. The 2012 Updated Transition Plan only provided a chart of anticipated projects for 2011 through 2016, which included 1022 ADA ramps, without any specific locations identified.  In a statement following the chart, the City admitted the inadequacy of its Plan: "[t]here are probably 5000 locations still in need of ramp work of some degree" and at the proposed rate of projects, "it will likely take another 20 years to make the community totally accessible."

38.     The only specific plan contained in the 2012 Updated Transition Plan was the plan to complete a new ramp survey which had started in 2011. The ramp inventory was to be completed by 2014 to obtain "a more accurate count of the total number of ramps (conforming and non-conforming) within the City of Peoria." According to the 2012 Updated Transition Plan, only 10% of the ramp inventory was completed.

39.     The City's 2012 Updated Transition Plan acknowledged that the City is obligated to make its sidewalks compliant with the ADA, not just the curb ramps. Notwithstanding, the Updated Transition Plan provided for the completion of a survey of the sidewalks started in 2011 but did not provide for any schedule of repairs, a prioritization of repairs, or funding for the repairs of non-ADA compliant sidewalks.

40.     Now, more than a decade later, the City has not issued any public reports regarding the results of the surveys of curb ramps and sidewalks which should have been completed in 2014 pursuant to the City's 2012 Updated Transition Plan.

41.     Now, 12 years since the last Updated Transition Plan, the City has not issued any further Updated Transition Plans to provide a plan, funding, or schedule to ensure that the City's pedestrian rights-of-way comply with the ADA.

42.     According to a Peoria Star Journal article published on August 13, 2017, Scott Reise, then-Director of the City's Public Works Department, stated that the Department allocated $200,000 per year for the construction of ADA-compliant curb ramps. Notwithstanding the allocated funding, Mr. Reise stated that the City's plan for 2017 was to install only 10 ramps. Mr. Reise admitted that the City "has a long way to go to make all of its streets accessible to the disabled." He further admitted, "We're not to 50% (of all streets) yet, but we try to *whittle away* at it by doing *some* each year." [Emphasis added.] https://www.pjstar.com/story/news/politics/county/2017/08/12/advocate-pushes-peoria-to-be/19741946007/

43.     Without accessible curb ramps and sidewalks, Named Plaintiffs and members of the class cannot access the City's pedestrian rights-of-way, buses, or their intended destinations at all or, if they can, they do so with significant delay, difficulty, and even danger.

44.     Many pedestrian rights-of-way are broken, cracked, crumbled, sunken and/or caved concrete, and are therefore due for maintenance. Upon information and belief, the City has no plan to maintain curb ramps or accessible sidewalks after they are built.

45.     Defendants have systemically failed, and are failing, to install and maintain accessible pedestrian rights-of-way in violation of federal law herein cited. As a result of Defendants' policies and practices regarding the City's pedestrian walkways and disability access,

the pedestrian rights-of-way are characterized by pervasive disability access problems. Those problems include but are not limited to the following examples:

a.  Missing or unsafe, non-compliant (slopes too steep, deteriorated curb ramp lips, lack of landing, lack of truncated domes, are not aligned with crosswalks) curb ramps;

b.  Pedestrian rights-of-way that are cracked, crumbled, steep, sunken or uneven or that have improper slopes or broken and inaccessible surfaces;

c.  Physical barriers on the sidewalk between intersections such as improperly placed streetlights, utility posts, traffic sign posts; and

d.  Bus stops lacking accessible ramps and sidewalks, waiting areas, and sidewalk access.

46.  As recent as May of 2024, a survey of 24 intersection crosswalks in Peoria demonstrated non-compliance at every intersection with one or more elements of the ADA accessibility guidelines for curb ramps, including lack of curb ramps; non-compliant running slopes, cross slopes, and widths of curb ramps; non-existent or non-complaint landing areas and turning spaces; lack of alignment of curb ramps; and lack of detectable warning surfaces on ramps. The following photographs are examples of some obvious non-compliant intersection curbs in Peoria:



Adams and Main St SW Quadrant looking South



Southwest Corner of Monroe & Main St. looking South



Atlantic and Norwood SE Quadrant



Prospect & McClure NW Quadrant looking West



Woodbine & Forrest Hill



Thrush & Knoxville SE Quadrant looking South



Missouri & Illinois SW Quadrant looking West



Bestor & Richmond NE Quadrant looking North



Gale & Douglas SW Quadrant



Woodhaven & Parkridge SW Quadrant looking South



Molleck & Reservoir SW Quadrant looking South



Sterling & Bainter SW Quadrant looking South



Western & Kettelle SE Quadrant looking East



Green & Madison SW corner looking West



McBean & Merriman SE quadrant looking South



Madison Park & Starr SE quadrant



Loucks & Sheridan NW quadrant looking North

47.      As recent as May of 2024, a survey of 52 stretches of sidewalks in Peoria were inspected for compliance with ADA accessibility guidelines for width, condition of surface, changes in grade, and obstructions. Of those 52 areas of sidewalks, only four were found to be

compliant. The following photographs are examples of some obvious non-compliant sidewalks in

Peoria:



Prospect St. from Tripp to Glen Oak West Side of the Road at Prospect & Tripp Intersection

looking south.



West side of Prospect. Prospect & Norwood Intersection Looking South



West side of Prospect near Corrington Intersection looking South



West Prospect at Virginia looking South



Peoria Zoo sign West Prospect



Homestead & Adams west side of Street looking South



Fairholm & Adams West side of Adams looking North



West side of Adams at Spitznagle looking South



Green & Madison SW corner looking West



North side of Main Street at Douglas looking East

48.     As recent as May of 2024, a survey of 17 bus stops in Peoria demonstrated that more than half of the bus stops do not meet ADA accessibility guidelines, including such elements as a firm stable surface, landing pad, a cross slope no greater than 2%, and accessible connections

to a street, sidewalk, path, etc. The following photographs are examples of obvious inaccessible bus stops in Peoria:



Bus Stop ID 7900



Bus Stop ID 1161



Bus Stop ID 1231



Bus Stop ID 1390



Bus Stop ID 1370



Bus Stop ID 1132

49.     As a result of Defendants' policies and practices regarding the City's pedestrian walkways and disability access, large segments of the City's pedestrian rights-of-way do not comply with new construction or alteration accessibility requirements. As a result, persons with mobility disabilities have been denied meaningful access to the City's pedestrian rights-of-way,

public buildings, parks, transportation, and/or places of public accommodation either through complete denials of access or through a delay of travel or unsafe conditions.

50.     These systemic failures have caused the City's pedestrian rights-of-way to be inaccessible when viewed in their entirety in violation of federal law.

51.     These barriers are not isolated or limited circumstances. Rather, these barriers are present throughout the city, thus denying access to persons with disabilities city-wide. Persons with mobility disabilities encounter numerous obstacles to using pedestrian rights-of-way throughout the city. As a result of these barriers, persons with mobility disabilities have been denied access to accommodations or public services. Furthermore, these barriers discourage individuals with mobility disabilities from exploring or visiting other areas of the city. These barriers have also delayed travel and cause these individuals to fear for their safety, as these conditions often create situations that are dangerous for persons with mobility disabilities.

52.     This discrimination and systemic inaccessibility have a severe negative impact on persons with mobility disabilities within the city as represented by the experiences of the Named Plaintiffs.

### <u>EXPERIENCES OF THE NAMED PLAINTIFFS</u>

***Donald Yarbrough***

53.     Mr. Yarbrough resides in the 1600 block of East Resthaven Road in Peoria. Mr. Yarbrough is active in the community and operates a non-for-profit organization, Veterans Helping Veterans, which collects, fixes and distributes wheelchairs to veterans in Peoria and the surrounding areas. While out in Peoria for leisure activities and for his organization, Mr. Yarbrough routinely confronts physical barriers on sidewalks when attempting to access the City's services, including, but not limited to:

49

a.    Severely broken and deteriorated concrete on sidewalks, light and telephone poles obstructing sidewalks for people using wheelchairs to pass, and deteriorating curb cuts and crosswalk pavement on North Prospect Road, from at least the 3200 block to the 3400 block;

b.    Cracks in, deterioration of, and disrepair of sidewalks, the curb cut landings, and crosswalk pavement on North Sterling Avenue from I74 to the 3300 block;

c.    Missing or deteriorated curb cuts in the islands and lane dividers in the intersection of North Sterling Avenue and West Forrest Hill Avenue;

d.    Cracked and deteriorated sidewalks along North Sterling Avenue, north of Forrest Hill Avenue;

e.    Deteriorated curb cuts at the intersection of West Forrest Hill Avenue and North Gale Avenue with curbs at the top of the ramps.

54.    To avoid injury posed by those barriers, Mr. Yarbrough often tries to avoid these areas or traverse them at great peril to his safety.

55.    As a result of the foregoing, Mr. Yarbrough has been and continues to be denied equal access to his community that persons without mobility disabilities enjoy. He is often deterred from navigating the pedestrian rights-of-way in the city, to visit public facilities, places of public accommodation, and friends because he chooses instead to remain safe from serious risks involved in navigating the inaccessible pedestrian rights-of-way.

### Chris Mitchell

56.    Ms. Mitchell resides in Peoria in the 1400 block of East London Avenue. She has lived there since 2011. She has been a resident of Peoria since 1985.

57.    Ms. Mitchell is deterred from walking in her immediate neighborhood utilizing her walker because of the deteriorated sidewalks, physical barriers in the sidewalks, and the lack of curb ramps. Those conditions and barriers preclude her from utilizing the City's pedestrian rights-of-way for fear of injury to herself.

58.     As a result of the foregoing, Ms. Mitchell can only travel around town by paratransit bus or if she is offered a ride. She has been and continues to be denied equal access to her neighborhood and other parts of her community that persons without mobility disabilities enjoy. She is deterred from navigating the pedestrian rights-of-way in the city, to visit public facilities, places of public accommodation, and friends because she chooses instead to remain safe from serious risks involved in navigating the inaccessible pedestrian rights-of-way.

## COUNT I

### VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, *et seq.*

59.     Named Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs 1-63.

60.     The ADA was enacted, based upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. §§ 12101(a)(2).

61.      The statute states that the purpose of the ADA is to provide a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1)-(2).

62.     The statue further states that: "[N]o qualified individual with a disability shall, by reason of such a disability, be excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. §§ 12132.

63.     At all relevant times herein, the City was and is a public entity within the meaning of Title II of the ADA and provides a program, service, or activity to the general public.

64.     At all relevant times herein, the Named Plaintiffs were and are qualified individuals with disabilities within the meaning of Title II of the ADA, and they met the essential eligibility requirements for the receipt of the services, programs, or activities of the City. 42 U.S.C. §§ 12131.

65.     Defendants are mandated to operate each program, service, or activity "so that, when viewed in its entirety, it is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § § 35.150, 35.149 & 35.151.

66.     Pedestrian rights-of-way themselves constitute a vital public program, service, or activity under Title II of the ADA. 28 C.F.R. § 35.104; *Everson v. Board of Educ. of Ewing Twp*., 330 U.S. 1, 17–18, 67 S.Ct. 504, 91 L.Ed. 711 (1947), *Culvahouse v. City of LaPorte,* 676 F.Supp.2d. 931, 939 (2009); *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir.2002).

67.     The regulations implementing Title II of the ADA specifically provide that a public entity must:

a.    Ensure that its existing facilities are accessible to persons with disabilities, and to have a transition plan to ensure access for persons with disabilities to public entity facilities, including a reasonable curb ramp installation schedule and reasonable plans for sidewalks. 28 C.F.R. §§ 35.133(a); 35.149; 35.150(a) & (d).

b.    Update transition plans for public rights-of-way facilities and provide a schedule for curb ramp installations that meet the applicable ADA requirements. 28 C.F.R. § 35.150 (a),(d)(1) & (2).

c.    With respect to existing facilities, including sidewalks, "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. §35.150(a). Compliance with those requirements may be achieved through, among other methods, alteration of existing facilities or construction of new facilities. 28 C.F.R. § 35.150(c). Where structural changes are required to comply, such changes shall be made as expeditiously as possible. *Id.*

52

d.     Ensure pedestrian facilities, where provided within its jurisdiction, are accessible to persons with disabilities, and accessibility must be provided at the same time that a new or altered facility is constructed and be within the scope of the construction project. 28 C.F.R. §§ 35.149 – 35.151.

e.     Install curb ramps at intersections whenever it newly constructs or alters sidewalks, streets, roads and/or highways at any time after January 26, 1992 and must comply with the Uniform Federal Accessibility Standards (UFAS) or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG). 28 C.F.R. § 35.151. A street resurfacing project by a public entity is an alteration under the meaning of the regulation. *Kinney v. Yersalim,* 9 F.3d 1067, 1073-74 (3rd Cir. 1993).

f.     Maintain the features of all facilities required to be accessible by the ADA. 28 C.F.R. § 35.133. Facilities required to be accessible included roads, walks, and passageways. 28 C.F.R. § 35.104.

68.     In the 32 years since the City was required to have an appropriate Transition Plan, Defendants have violated the ADA with the absence of any policies, procedures, and training to survey, install, inspect, and maintain its pedestrian rights-of-way system to be accessible to persons with disabilities, notwithstanding its Transition Plan and subsequent update.

69.     The City's pedestrian rights-of-way are not fully, equally, or safely accessible to Named Plaintiffs and members of the class when viewed in their entirety. The pedestrian rights-of-way within the City's jurisdiction include facilities within the meaning of ADA and UFAS. Since January 26, 1992, Defendants have constructed, altered or repaired parts of these facilities within the meaning of the ADAAG, and the UFAS. Through their policies and practices, Defendants have failed to make such facilities readily accessible to and usable by persons with disabilities in violation of 28 C.F.R. § 35.151.

70.      Defendants committed these acts and omissions with deliberate indifference and intentional disregard of the Named Plaintiffs' and the class members' rights.

71.     As a direct and proximate result of the aforementioned acts and omissions, Named

Plaintiffs and members of the class have suffered, and continue to suffer a loss of a civil right, due

to Defendants' failure to address accommodations, modifications, services and acts as required for

the Named Plaintiffs' disabilities and the class members' disabilities.

72.     Defendants' conduct constitutes ongoing and continuing violations of the ADA.

Unless restrained from doing so, Defendants will continue to violate the ADA. This conduct,

unless enjoined, will continue to inflict injuries on Named Plaintiffs and the members of the class

for which Named Plaintiffs and the class members will have no adequate remedy at law. Therefore,

pursuant to 42 U.S.C. § 12133, Named Plaintiffs and members of the class are entitled to injunctive

relief, as well as reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs and members of the class pray for the following relief:

a.      A preliminary injunction and a permanent injunction, prohibiting Defendants from
        violating the ADA, 42 U.S.C. § 12133, *et seq*., and compelling each Defendant to
        undertake remedial measures to mitigate the effects of Defendants' past and
        ongoing violations of Title II of the ADA, and regulations promulgated thereunder.
        At a minimum, Defendants must be ordered to take the following actions:

   i.      Develop ADA-compliant design guidelines for the City's sidewalks, curb
           ramps, and other pedestrian rights-of way;

   ii.     Utilize the ADA-compliant design guidelines to conduct or cause to be
           conducted a comprehensive survey of all pedestrian rights-of-way owned or
           maintained by the City to identify all areas of non-compliance;

   iii.    Prepare a specific plan, including funding, to remediate all non-compliant
           pedestrian rights-of-way owned or maintained by the City; and

   iv.     Create and implement policies for construction/alteration, inspection, repair,
           maintenance, and of pedestrian rights-of-way to ensure compliance ADA-
           compliant design guidelines.

b.      An order certifying the case as a class action pursuant to FED. R. CIV. P. 23(a) and (b)(2) or (b)(3), and appointing Named Plaintiffs as class representatives and their attorneys as class counsel;

c.      The appointment of a monitor to verify the Defendants' compliance with the ordered injunctive relief, reporting the City's progress to the Court and all parties every three months;

d.      An award of compensatory damages to Named Plaintiffs and class members;

e.      An award of reasonable attorneys' fees and costs to Named Plaintiffs and class; and

f.      Such other relief as the Court deems just.

## <u>COUNT II</u>

**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973,
29 U.S.C. § 794 *et seq.***

73.     Named Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1-63.

74.     Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. § 794(a).

75.     Named Plaintiffs are otherwise qualified to participate in services or activities that are provided to individuals in the City. *See* 29 U.S.C. § 794(b).

76.     The City is a direct recipient of federal financial assistance sufficient to invoke the coverage of 29 U.S.C. § 794 and has received such federal financial assistance at all times relevant to the claims asserted in this Complaint.

77.     Regulations implementing 29 U.S.C. § 794 require public entities that receive federal financial assistance to conduct a self-evaluation and create a transition plan by June 3,

1978. 45 C.F.R. § 84.22(e). Similar to the ADA requirements, transition plans under the Rehabilitation Act must include, among other things, an up-to-date schedule for providing curb ramps or other sloped areas where the pedestrian right-of-way crosses streets. 45 C.F.R. § 84.22(e).

78. Under 29 U.S.C. § 794, a recipient of federal financial assistance must install ADAAG- or USAF-compliant curb ramps at intersections whenever it newly constructed or altered sidewalks, streets, roads, and/or highways at any time after June 3, 1977. *Willits v. City of Los Angeles*, 925 F. Supp. 2d. 1089, 1094 (C.D. Cal. 2013).

79. Defendants have failed and are failing to prepare and implement a transition plan which is compliant with the requirements of the Rehabilitation Act, in violation of 45 C.F.R. §84.22(e). Defendants, their agents and employees, have violated and continue to violate the Rehabilitation Act and regulations promulgated thereunder by excluding Named Plaintiffs and members of the class from participation in, denying Named Plaintiffs and members of the class the benefits of, and subjecting them, based solely by reason of their disability to discrimination in the benefits and services of the City's pedestrian rights-of-way and for the reasons set forth above.

80. Defendants have violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to construct or install compliant curb cuts at intersections and maintain compliant sidewalks throughout the City where it has newly constructed or altered streets, roads and/or highways since June 3, 1977.

81. Defendants committed the acts and omissions alleged herein with intent or with deliberate indifference to Named Plaintiffs' and the class members' rights.

82. As a direct and proximate result of the aforementioned acts, Named Plaintiffs and members of the class suffered and continue to suffer a loss of civil rights, humiliation, hardship,

and anxiety due to the Defendants' failure to address accommodations, modifications, services and acts as required for their disabilities.

83.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

84.     Named Plaintiffs and members of the class are entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs and members of the class pray for the following relief:

a.     A preliminary injunction and a permanent injunction, prohibiting Defendants from violating Section 504 of the Rehabilitation Act, and compelling Defendant to undertake remedial measures to mitigate the effects of Defendants' past and ongoing violations of Section 504 of the Rehabilitation Act, and regulations promulgated thereunder. At a minimum, Defendants must be ordered to take the following actions:

   i.     Develop ADA-compliant design guidelines for the City's sidewalks, curb ramps, and other pedestrian rights-of way;

   ii.    Utilize the ADA-compliant design guidelines to conduct or cause to be conducted a comprehensive survey of all pedestrian rights-of-way owned or maintained by the City to identify all areas of non-compliance;

   iii.   Prepare a specific plan, including funding, to remediate all non-compliant pedestrian rights-of-way owned or maintained by the City; and

   iv.    Create and implement policies for inspection, repair, maintenance, and construction/alteration of pedestrian rights-of-way to ensure compliance ADA-compliant design guidelines.

b.     An order certifying the case as a class action pursuant to FED. R. CIV. P. 23(a) and (b)(2) or (b)(3), and appointing Named Plaintiffs as class representatives and their attorneys as class counsel;

c.     Appointment of a monitor to verify the Defendants' compliance with the ordered injunctive relief, reporting the City's progress to the Court and all parties every three months;

d.     An award of reasonable attorneys' fees and costs to the Named Plaintiffs' and class members; and

e.     Such other relief as the Court deems just.

Donald Yarbrough, Chris Mitchell, and Willie Anderson, individually on behalf of themselves and all other persons similarly situated, plaintiffs,

By:     /s/ Jennifer M. Sender
        One of Their Attorneys

Jennifer M. Sender (ARDC No. 6207774)
Attorneys for Plaintiffs
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 W Madison St., Ste 4000
Chicago, Illinois 60602
T: (312) 604-2778
E: jsender@hsplegal.com

Carl F. Reardon (ARDC No. 2295725)
Attorney for Plaintiffs
120 Illini Drive
East Peoria, IL 61611
(309) 699-0787
carlreardon@comcast.net

Jim Rochford  (ARDC No. 6186168)
Nina R. Gougis
Jim Rochford & Associates
101 SW Adams, Suite 700
Peoria, IL 61602
(309) 637-5322
jrockford@rochfordlaw.com
ngougis@rochfordlaw.com